Deepwater Drilling, Inc. May it please the Court, Robert Logue for Appellant Eni. The District Court's ruling here in favor of Transocean was fraught with legal errors and glaring omissions. It read key terms out of the contract. It misread provisions which were just definitional to bar Eni's positive claims. It failed to apply the proper damages methodology, which can't even be defended by Transocean, on appeal. It failed to address the 2011 notices and failed to even explain what it thought initial correction meant under the contract. It relied on Transocean's say-so that it was ready, willing, and able to perform. It relied on evidence that was not even in the record. And it omitted any findings regarding good oilfield practice, did not define the term, and it ignored all the experts who said different things, such as the bent frame for the blowout preventer was a violation of good oilfield practice. We don't even know what the District Court thought about that because it didn't make any findings as to what good oilfield practice is bent or whether it was rejecting that testimony on any grounds. Those errors, those omissions are what allowed the Court to summarily reject Eni's claims of breach and to hold Eni inappropriately terminated the contract. Let me focus on termination first. The parties here, a key provision they put in their contract was Section 509, which required the Transocean, and I quote, to maintain well-controlled equipment in good conditions at all times. And expressly that included the blowout preventer and the key components of the blowout preventer. And, of course, that's true because they put that in there because that is a key safety equipment that we learned with the Deepwater Horizon. It was the failure of the blowout preventer there which caused a massive loss of life and the environmental disaster. I think it's helpful to sort of get a picture of the blowout preventer. It's a five-story tall, 450-ton unit that sits on top of the wellhead and sits around the drilling pipe, and it's critical because there's going to be kicks up from the drilling hole of dangerous, flammable gases, and it is the blowout protector which protects those from going up to the drilling unit. But on the Deepwater Pathfinder, that critical equipment failed repeatedly 48 times during the three-year period, all due to Transocean and its agents' failures. And during that three-year period, there was an unplanned pull 18 times of that entire unit. That means you have this unit, the five-story, 450-ton unit, thousands of feet under the water, and unexpectedly, because of failures, you have to pull the whole thing thousands of feet up onto the rig once again. The experts testified even to have one year is exceptional, but to have 18 times in three years is completely unacceptable. Given the failures again and again and the Band-Aid approach they had to fixing the blowout protector and the pods that run it, the brains of the blowout protector, it was understandably that the contract allows any to terminate the contract here. Section 203 and Section 1305 permit termination. Let me start with Section 203. It requires notice. There was ample notice here. Starting in March 29th of 2011, there was a specific formal notice sent with the magic words of a material nonconformity with the contract, specifically identifying the blowout preventer, specifically identifying the pods, which are the brains of the blowout preventer. If those pods are not operating, that whole 450-ton unit is useless. What fires the mechanisms that keep those fumes, the dangerous fumes down, are the pods. So what does the — what are they required to do under 203 once notification has been made? They are required to initiate an actual correction, which will first — requires them to identify the root cause of the problem. Didn't the district court find that there was such an initiation? I realize it kept breaking again, but there was an initiation of the correction. Well, we don't know what the district court thought it meant by that. We have an argument by Transocean that, on appeal, that initiation means just start it, even if it didn't ever work. It's like the guy coming to fix your dishwasher, takes apart, you know, the units, and then just goes and has a sandwich and never comes back. He initiated a correction. Is that what the district court thought? We don't know what the district court thought, because the initiation here, as the experts showed, was again and again was just a band-aid approach to the blow-up preventer and to the pod failures. The failures — the pods kept failing again and again and again. I understand that it worked for a while and then broke again. Or did it never work? Well, they would — it's like if you go to — you have a flat tire, and you go to the gas station, and they pump air in it. They say, well, you don't have a flat tire anymore. Go on your way. And then two hours later, you have a flat tire again. That's what it's analogous to. But let's go over from the 329. They give a notice that the blow-up preventer and the pods are defective. We have another failure just a few days later on April 4th. And then another notice we send them on April 5th. They say, look, the pods are not working on the blow-up preventer. They're crucial. There's another failure the next week on April 13th. Another notice is sent two days later. This is — there's no absence of notice. Then on May 4th, this is way beyond the 30-day period, and he sends a notice to them saying the repairs you have are insufficient. They are not within the contract's definition of initiating a correction that's actually fixing the problem. The blow-up preventer remains unreliable. It's not ready for the high-pressure-type drilling that we have — we're paying you a lot of money, $650,000 a day, for high-pressure drilling. And this is not — this is not able to perform those tasks. Of course, we have no findings at all about the 2011 notices as to whether they were adequate or not from the district court, completely ignored, or as to whether those Band-Aid approaches the district — the Transocean took were satisfactory. On appeal, they argue, well, it's too late. They — you're terminating now in 2014, and you gave those notices earlier. Well, there's no finding of waiver or that the notice — earlier notices were too late by the district court, a complete absence of that. And certainly they're not in good faith. And he kept working with Transocean, trying to find solutions to these problems. It ultimately came up with a performance improvement plan that Transocean promised that it would implement. It failed to do so. Then — and he's still not wanting to terminate, sue them, saying we're suing you, so you'll conform with the contract, so you'll comply with it. And still they did not. And then, ultimately, there was the last straw in 2014, when the drawer works collapsed, and a dramatic collapse which could have been fatal to the employees. Transocean said they fixed the problem. Then two days later, it fails again. Transocean says they can't identify the root cause of the problem. That's it. In all these problems, they're never getting to the root cause of the problem. And, indeed, a Transocean report we cite in our reply brief says that they themselves criticized themselves for never getting to the root of the problem, instead of putting these Band-Aid approaches on it. So the drawer works is certified by them on October 3rd as working, and then October 5th it fails again. And then five days later, the blow-up preventer again fails, the pods fail, and the connecting tubing, and there's an unplanned pull. That whole big 450-ton unit has to be pulled up again. Annie, at that point, had decided that enough was enough. They had cut enough slack to Transocean. Given all these safety or failures, they needed to terminate. And October 13th, they sent that termination letter. Weren't they trying to negotiate another four years in Ghana? I mean, despite all these problems, wasn't your client trying to negotiate? That just shows the good faith of Transocean here. All throughout this, they were — I'm talking about your client. Excuse me? Didn't your client try to negotiate another four years to use the Pathfinder? Only after it was going to go under a substantial renovation, and it would not be used in the same — in the Gulf, where it's much more difficult to drill. So ultimately, that never came to fruition. So they were always trying to work with Transocean throughout this contract and try to get them to perform. This shows the good faith that we had in trying to work something out and trying to avoid having to terminate. It doesn't show anything about — as to whether they were trustworthy to continue to perform on this contract in the Gulf, in the deep-water drilling that we were hiring them to do. How deep is the water off of Ghana? That's not in the record, Your Honor. But you must know if you're comparing the water in the Gulf to being much deeper than the risk you would have to take in Ghana. Well, they were hired to keep to a certain contract in certain drilling wells here in the Gulf. They were not going to be able to perform that. The parties recognized that this drilling rig needed to go a complete renovation, needed to go into dry dock and be fixed for months and months and months, and it was not going to be able to perform on this contract. Indeed, the drilling well never performed again. It was in such bad shape that after this, they could never get anyone to buy it or use it, and it has never been used since, since 2014. It is now just a piece of junk sitting in the ocean, right? So the fact that we continued to negotiate to see if there was some way we could have this brought into dry dock, spend six months, send a year renovating it and get a new skilled staff working it, it says nothing about their ability to conform with this contract. But in any event, we gave them notice of the material nonconformity under 203, and then we terminated with a termination letter on October 13th. And in there, we cited the — But wasn't that a notice of termination letter? Weren't you supposed to follow it up with a termination — a second letter? Ultimately, there was a termination letter, Your Honor. Well, it was a notice of termination, and then weren't you under the contract supposed to follow up with a second letter? No, no. The notice is the notice of the material nonconformity. So that was sent. That March 29th says we are giving you notice of a notice of a material nonconformity with the contract. That's basically warning them that we're going to — we could terminate any time if you don't do your job. Right, but didn't you owe them a follow-up letter? A follow-up is a termination. If you don't do your job, we have the right then to terminate. Was there a follow-up letter? That would be the October 13th termination letter, Your Honor. But that was the notice of termination. No, that — the notice required by 203 is the notice of material nonconformity. And as I said, in the March and April, we gave repeated notices regarding the blowout preventer pods and their failures being nonconformities under the contract. So we've given them that notice. They have the opportunity to fix those problems. Again and again, they showed the inability to actually fix and get to the root cause of the problem. In October 13th letter — Can I just clarify something? We're talking about two different termination options, right? We're talking about 203 and then also 1305 as a separate theory? There's two different — right now I'm talking about 203, but 1305 is the second one. 1305 is the one where you have the two different letters. I think that comes from the — I just want to make sure we're — I'm sorry, Your Honor. If you're talking about 1305, I'm talking about our right to terminate under 203. Okay. And in that termination letter under 203, it cites the failures over the last three years, including the blowout preventer, the failed cure efforts over the time, and that the performance improvement plan simply didn't work and that it was simply now an unreliable drilling rig, unsafe. The district court here failed to even engage on the 2011 notices or explain why they were insufficient for the termination letter on the October 13th termination letter. Let me just get to the 1305 just for a second. Just one final question on 203. I take it there's no dispute that Transocean did try to fix it. Your point is just they kept failing to fix it. Again, putting the air into the tire is not actually trying to fix it, finding the root cause and actually — it says correction to conform to the contract. So it's not just trying to fix it so you're going to pass the next test. I'm just trying to get to the nub of what the dispute is between the parties to see if it's a factual or legal one. Is your point that basically anything they did was essentially bad faith? It was incompetent. The contract requires initiating the correction. And your point is they didn't do that because it was a bad faith effort? Is that the idea? They need to initiate a correction by identifying the root cause problem and to solving it. That just putting a Band-Aid on a problem and having it fail and over again, that's a question of contract interpretation, which we don't have even the district court's decision in how he's reading the contract, Your Honor. The key provision of 1305 is that it's based on the good faith belief of Eni, my client, that there was a violation of a safety regulation. The district court just engaged on it. Well, I find that the agency said didn't issue an actual citation there, so there must have not been a regulatory violation, and therefore you can't invoke 1305. But, of course, the requirement here is one of — there is no good faith by Eni in invoking this, and there is no such finding by the district court here. My time is waning. Let me just turn to damages for a second. The Transocean can't even defend the damages methodology employed by the district court here. In the case of a wrongful termination, you look at the non-breach world, what they would have made, what expenses they saved due to the termination, and you have to crunch those numbers. Here there's no finding, there's no assessment, there's no performing of that necessary methodology. Instead, the district court simply awards the standby rate of $637,000 a day. That is an absurd ruling. That standby rate was only paid 5 percent of the time during the contract. Even Transocean's own witness, Bill Sannin, their director, a Transocean director, admitted when he testified that the standby rate would have not likely been applied during the remainder of the year of the contract. That's at page 9565. In fact, if you look at the downtime and the nonpaid days over the prior three years, the average payment over the life of the contract was $584,000 a day, not $637,000 a day. Ultimately, the district needs to be remanded for this district court or another district court on remand to crunch those numbers and decide what actually they would have been paid given their past performance and given the current condition of the rig where it never performed again. If you look at what they did, they were never able to get even anyone to use the rig because it was in such a bad condition. Also, as we argue, they were not ready, willing, and able to perform. What did the district court cite about that? They just cited a letter, a say-so of Transocean themselves saying we stand by ready to perform, and the district court said that was adequate proof that they were ready to perform with all the requirements, including the requirement under Section 509, I guess, that all the critical equipment be in good conditions at all times. But we know at the time of termination that the blowout preventer was defective and that the drawworks were, of course, unreliable. And if I could just turn to our breach claims for a second. You have some time for us. Thank you. Good morning, Your Honors. Jessica Ellsworth on behalf of Transocean. What you just heard was a great closing argument, but it's not an argument that would enable this court to find any reason to reverse the district court's decision below. E&I litigated its affirmative claims through a multi-week trial on a single theory, which was that the Pathfinder's level of performance amounted to a breach of contract. It litigated its defense to Transocean's repudiation claim also on a single theory, that the drawworks and the yellow MUX cable issues in September and October of 2014 justified termination on October 13, 2014. You heard a lot about the earlier 2011 letters involving the issues that the blowout preventer experienced right after it came out of the shipyard. And, of course, it's not uncommon to experience problems when you're moving from a shipyard environment to the ocean. The main point I want to make about this is that the district court made a finding of fact, its finding of fact 88, that the only material nonconformity alleged in the purported termination related to the drawworks, not the earlier BOP letters. And it made that finding of fact for a reason, which is that E&I's vice president of operations testified that the rights E&I exercised in its letter under the contract that related to Section 203 were based on the drawworks. You can see that at 7890. He also was asked to confirm that the earlier BOP problems, these 2011 letters, were not the basis of the termination. And you can see at page 7889 that he agreed. They were not the basis of the termination. So E&I is coming here in its 203 argument and in many of its other arguments seeking a do-over, changing its theory, changing its requests, changing its arguments. But that's not what an appeal is supposed to do. You start with the district court's findings of fact. You start with the district court's conclusions of law. And you review them under the applicable standard of review, which is very deferential in this context. The repudiation claim that Transocean brought was successful because the provisions of the contract, Section 203 and Section 1305, did not allow for immediate termination. And you can see just by reading their termination letter that they sent on October 13th, they identified the drawworks failure, which, by the way, had already been certified as repaired and used to lift the blowout preventer. They identified that, and they identified the yellow MUX cable issue as justifying immediate termination. The district court was exactly right to say, for that reason alone, it could rule in Transocean's favor on the repudiation claim. On good oilfield practices, E&I has stood up and told you that the district court erred by not giving a definition to good oilfield practice, by not discussing extensive testimony about good oilfield practice. If you look at the proposed findings of fact and conclusions of law that E&I submitted to the district court, first, it never asked for a definition. Second, it never referred to good oilfield practices, with the exception of a single proposed finding of fact, which you can see at ROA 5167, and all that proposed finding of fact does is recite the contractual language. It doesn't say anything else. If you look at the evidentiary outline that E&I submitted to the district court, pointing the district court to where it could find evidence in support of E&I's position, you'll also find no evidence reciting definitions of good oilfield practice. And if you look at what the district court did when it got to this claim, it understood that E&I's entire theory was that somehow the performance level was insufficient, either under the contract or under some sort of industry standard. And the district court dealt with that, and it explained, and it credited testimony. You can see in the footnotes significant amounts of testimony that the district court is citing to, where the district court found that this was not a contract that included a ceiling on the amount of nonproductive time. It was not a contract that required a certain amount of time between equipment issues. And the reason it didn't, among other things, is that these sophisticated multinational corporations had negotiated a very careful rate allocation in the contract so that everyone's economic incentives were aligned. E&I wanted the rig to work so that it could drill. Transocean wanted the rig to be operating so that it could get paid. If the rig wasn't operating, the rates started going down, and if it didn't operate for an extended period of time, the rates went to zero. So everyone was in this sort of working towards the same goal. The amount of nonproductive time that this rig experienced, depending on whose expert you listened to, was somewhere between 16% and 18%, 19%. E&I's entire fleet of joint venture rigs during this time period had 14% nonproductive time. So it's not out of the realm of what E&I was experiencing on its whole fleet. For all of these reasons, the district court did exactly what it was required to do. If I could address briefly the cases that Your Honors asked about yesterday, those cases, I think, draw a line that is useful to think about in this case. When are there insufficient findings? When is there an ambiguity in what the district court has done that requires, that precludes this court from being able to assess clear error? And one, is there not? When is there a sufficient basis for this court to review the findings? E&I hasn't identified any finding of fact that the district court made that involved ambiguity. It hasn't identified any contradictions. The cases that you all identified in your order yesterday — Roberts. I think their argument is that the district court simply didn't issue — Kovner. Well, Your Honor, if that's their argument, I think that they are sorely mistaken. And I'm happy to walk you through some of what I think are the most crucial findings. If you start — I think their point is there were plenty of findings on the — this is in terms of E&I's claim, the contract claim. I think they're saying there are plenty of findings with respect to complying with the contract. The question is, were there findings as to good oilfield practice? Do I understand that correctly? Your Honor, it's a little bit difficult — I think you're right. You would really have to ask Mr. Loeb for his view of that. But I think you're right. Were there findings as to good oilfield practice? So, yes. I think there are, and you can see them in two different places. If we start with what the district court said — so E&I talked specifically about the frame and about the state of Transocean's equipment and repairs. If you look at findings of fact 12 and 13, the district court found that the frame was repaired by the OEM during the shipyard period, and it was certified as repaired by the company hired by E&I to inspect it. That was Magispect. And, indeed, that Magispect signed its approval on every component of the BOP stack. Lloyds Register certified the BOP system complied with the NPL requirements, the notice to lessees that had led to the moratorium. If you look at the arguments about the state of Transocean's equipment and repairs, you can see in finding of fact 10 that the district court found that before the Pathfinder began operations and before every well, Lloyds Register, again, the company hired by E&I, inspected and verified the well control equipment and said that it met all obligations. And in that regard, I think it's worth noting what these well compatibility verifications are. These are hundreds of page-long documents that document everything that was done to disassemble, inspect, install, replace, reassemble, pressure test, function test, and the test results. If you want to see an example of one, you can look for Defendants Exhibit 271. That is the one from July of 2014, which was before the last well, and it runs 300 pages. And in that certification, what Lloyds is required to do is to certify that the stack has not been compromised or damaged from previous service and that the stack will operate in the conditions in which it will be used. So you have all of this information that the district court has looked at and has assessed about the efforts Transocean went to and that E&I went to to make sure that the rig was ready to drill before it started any drilling operations. Do I understand, then, that so you're not disputing that there has to be findings? You're not relying on this implicit finding theory? Well, I think to the extent that Your Honors think that there is any question that the findings are sufficiently specific, then there are implicit findings that support all of this. And the way this Court has looked at implicit findings is essentially to fill in the gap, fill in any gaps where it's clear what the district court was ultimately intending to do or what inferences can be drawn from the things that the district court said. And the district court said in many occasions, in many of its findings of fact and many of its conclusions of law, that Transocean had done everything necessary to get the rig ready to drill. When there was a problem, Transocean responded to the problem. It solved the problem. It got the rig ready to drill again. And, in fact, this rig did drill. It was engaged in 13 operations on 12 different wells. Tens of thousands of hours were spent on the operating rig, actually engaged in drilling work. So the mere fact that there was a higher overall percentage by some small percent than E&I wanted wasn't enough to find that there was a problem with good oilfield practice. And, again, I note that E&I wasn't asking for a ruling on what good oilfield practices meant. The way this case was tried to the Court, both parties presented experts and witnesses who talked about what had happened, and then they were asked whether that, in fact, did comply with good oilfield practice. Some of the testimony that the district court cites in its findings of fact, you can see this if you look at the findings of fact 58 to 60 and finding of fact 88. In particular, the district court cites some testimony from Transocean's expert Perrin Roller. Mr. Roller was asked these are questions that are in the transcripts identified in the footnotes there. Footnote 48 cites this. Mr. Roller, do you have an opinion as to the sufficiency of Transocean's response to nonproductive time? Yes. Did Transocean respond using commercially reasonable efforts to conform with good oilfield practice? Answer, yes. In my opinion, and having worked in this area for a number of years, I believe they were commercially reasonable and used good oilfield practice. He goes on. Question. This is also cited in footnote 48. Is it good oilfield practice to do testing and repairs as Transocean did? Answer, yes. Absolutely it is. Question. Is it good oilfield practice to involve the OEMs as Transocean did? Answer, yes. That is definitely good oilfield practice to get them involved on complex pieces of equipment. And I could go on. The district court understood that their good oilfield practice and their contract claim overall relied on this theory that somehow the level of nonproductive time was too high. And the district court said no. The district court said in its findings of fact, excuse me, in its conclusions of law, that excessive nonproductive time, not maintaining equipment in good condition, and short time frames between equipment failures couldn't support E&I's breach of contract claim because the contract contained no performance promises of specific amounts of operating days, drilling time, or drilling completion. And viewed as a whole, this is now conclusions of law 16, 17, and 21. Viewed as a whole, the contract showed the parties clearly envisioned there would be equipment failures, clearly envisioned time needed for replacement and repairs, and Transocean received the required certifications and verifications. So at a minimum, the district court implicitly concluded that there was no issue related to good oilfield practice. We think it's explicit in the decision itself, but to the extent Your Honors have any questions, it is very clear that the district court understood what the arguments were and simply disagreed with the presentation, the narrative that E&I had spun to the court in its trial presentation. If I could turn briefly to the damages question. This Court, in reviewing a damages ward, looks at whether the amount that's awarded is a reasonable approximation. Is it plausible in light of the record as a whole? And it doesn't reverse, even if it might have come to a different conclusion. E&I suggests in its reply brief that Transocean is making a new argument about damages, and I want to be very clear about that because we're not. This is the same argument that Transocean has made since its third amended complaint in its repudiation claim at paragraphs 53 and 54, where Transocean said that it was damaged in the amount of its contractual day rate from the date of repudiation through the end of the contract. It also said that in its summary judgment motion, and those are the two things that E&I cites as somehow showing this is a new argument. In Transocean's summary judgment motion, it again said at ROA 1388, Transocean would have received the day work rate through the end of the contract period, April 21, 2015, and in the absence of instructions, the applicable day rate was the standby rate. What the district court did is what this court has instructed courts to do and has said is consistent with determining expectation damages. The first place you look is the contract. Does the contract give you an indication of what the parties expected for performance? And the answer here is yes. The contract sets out a day rate that applies if E&I for any reason decides not to issue instructions. It may be it's having financial issues. It may be it wants to — it's lost its leaseholds. It may be that it wants to dedicate priorities elsewhere. For whatever reason, if E&I chooses not to issue instructions, the standby rate applies. That's what the district court did. The standby rate is between the full operating rate and the repair rate? That's right, Your Honor. It's 98 percent. And I think it's — on that point — Sorry, 98 percent. — of the operating rate. So the repair rate is 95 percent of the operating rate. Everything in the contract is cued off of the operating rate. Guido Tantori, who was E&I's vice president of operations, actually did his own calculation on October 4th, so just a week before they sent the purported termination letter. And his calculation, he titled the cost to suspend operations. Now, he used the operating rate instead of the standby rate. But the number he came out with was $124 million. The district court's number was $109 million. It involved a few less days, and the district court used the standby rate, which was 2 percent less than the operating rate. And, in fact, being conservative, the district court used the standby rate as it was originally set out in the contract. So it was roughly $637,000 a day. Mr. Tantori's email shows that even E&I recognized that the amount that was awarded here is a reasonable approximation of what E&I would have paid Transocean and what Transocean would have received had the contract been continued. E&I has also suggested that there was an issue with whether Transocean was ready, willing, and able to perform. And it has impugned the district court for citing only one thing, which is Transocean's letter back to E&I in response to this purported termination letter saying, hey, guys, we're here. We're ready to keep drilling. You can't just walk away. You look at that letter and you look at the entire context of the district court's decision in which it has rejected E&I's contentions that somehow the level of nonproductive time was too high, and the only reasonable conclusion is the district court was exactly right. Transocean was just as ready, willing, and able to perform on October 13th as it had been on October 12th, as it had been on October 11th. There was nothing that changed Transocean's position. It hadn't rented the rig to someone else. It hadn't taken its personnel and gone home. It was there. It was ready to follow E&I's instructions, and E&I simply chose not to give them. But did it ever operate again? Yeah, it did not. And I think there are findings of fact the district court made that are very clear. One is that Transocean did try to mitigate, and you can see that at conclusion of Law 43. The second and third are related. In 2008, when this contract was signed, the market was at its peak. It was really essentially a buyer's market for companies like Transocean because there were no rigs. In 2014, the market was dramatically different. There were many idle rigs out there, and there was not an opportunity, but not for lack of trying, that Transocean was not able to find someone else to use this rig. It wasn't due to the condition of the rig? There's nothing in the record that suggests it was due to the condition of the rig, and the district court, I think, made a number of findings that are useful here. One is that the mitigation efforts were engaged in in good faith. The second relates to the Ghana contract that I believe Your Honor asked about earlier. E&I itself was looking forward to using this rig for four more years if only the Ghana government had signed off on it. There was nothing that would have precluded this rig from being used due to its condition. It was simply a question of what was available on the market at that time. If Your Honors have no further questions. I have a question. I'm curious. Does Transocean still video their blowout preventers? Do they video their what? The blowout preventers? I have watched a number of YouTube videos about blowout preventers in learning about this case. They still do that, even after the Ocean Ranger? I mean, we watched it every day for months. I was curious as to whether you still have that practice. I may not know exactly what the practices that Your Honor is describing, but I have, in educating myself about this industry as a newcomer to it, I spent a lot of time trying to learn about blowout preventers. As Mr. Loeb said, they are five-story tall, extremely complex pieces of machinery operating in very harsh environments. It is not the equivalent of a flat tire or getting your watch battery replaced. I don't know what they are. I'm just curious about the video. That I do not have a specific answer to. Thank you. Thank you, Your Honors. Let me start with the termination letter. Counsel suggests that because they identify the most recent last straw events in the termination letter that the termination under 203 is limited to that. Section 203, this is a contract. It does not require the termination letter to say anything other than we hereby terminate. Where things need to be identified is in the notice of material nonconformity, and clearly that was done. Also, if you look at the letter that was provided on October 14th, it doesn't just talk about the drawworks. It talks about the three years that preceded that, including all the failures of the blow-up preventer and the failure under the performance improvement plan, Your Honor. So the district court was in error. If it thought that it didn't need to consider the early termination, I don't know what it thought it was doing, but it needed to consider the earlier termination letters. In regard to the good oil fill practices, there simply are not the findings that counsel pretends are there. When the district court discusses good oil fill practices, this is what it says. The parties do not define good oil fill practices, and that's it. We don't know what the judge — it's then the judge's job to actually interpret it and then to apply it. We have none of that in its opinion. Counsel says that good oil fill practices was not defined. If you look at the transcript, page 8-1-17 and 1-8, you have Paul Diaz testifying as to what it means, that it means a high standard for good oil fill practices for maintenance, repairs, diagnostic, testing, operations. It's not just commercially reasonable. This is the highest — this is the gold standard for operation of — in the oil field world. And we don't know what the district court thought about any of the particulars. We have two experts, Paul Diaz at 8-1-2-2 and Greg McGregor at 7-3-3-0, testifying that the use of a bent BOA preventer frame was not good oil fill practices. Sure, you could bend it back and get it certified, but they said just the using it at all is not good oil fill practices. What does the district court think? I don't know. What about the splicing of the hose, which is the cable connecting the pods to the communications? And Paul Diaz testifies at 7-0-8-3, that is not good oil fill practices to splice and re-splice that key critical equipment and to have it babied under low pressure so it would even work. That is not good oil fill practices. Unbending clamps and reusing them, Diaz testifies at 7-0-9-2, not good oil fill practices. Misrepresenting pressure and function tests, McGregor testifies at 7-4-0-5, not good oil fill practices. Deploying a first time and latching onto the first well is supposed to take four to five days. It took 50 days for Transocean. Greg Perkins testified that's not good oil fill practices. It shows you don't have a trained, ready staff. They set out the first time when, by their own testimony, critical systems were not ready. Again, not good oil fill practices. The testimony again and again, no findings. I have no idea what the district court thinks is the good oil fill practice standard or what it thinks about any of that testimony and why each and every one of those are not a violation of the contract, Your Honor. This contract, this ruling regarding good faith on 13-0-5 is not there. Regarding good oil fill practices is not there. Regarding termination on 2011, we don't know what the district court thought about any of those things. This decision is simply not sustainable. They can point to all sorts of different findings about the district court said that there was some corrective action taken here or that things were certified. That doesn't change the fact that we have an absence of finding what the district court even thought it meant to have an adequate correction under the contract. And here we have failure again and again and again of the same key equipment, and you have Transocean's own documents showing that they recognize they were never getting to the root of the problem. We don't even know what the district court thought it was saying when it said initiated correction. If it means just to paper over it and get a certification so it was going to break down two days later, which happened over and over again, that is simply not in compliance with this contract. For those reasons, we ask this court to reverse and to remand. Thank you, Your Honor. This will conclude today's arguments. These cases are under submission. The court is adjourned until tomorrow afternoon.